Karl L. Malloy
1600 Mill Quarter Road
Powhatan, Virginia 23139
Phone: (804) 528-1640
Fax: (804) 325-1092
Email: malloy@post.harvard.edu



*Pro Se*

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In Re | ) | Chapter 13 |
| | ) | |
| **KARL LINARD MALLOY,** | ) | Case No. **23-33442-KRH** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## DEBTOR'S BRIEF PURSUANT TO SCHEDULING ORDER

COMES NOW, *Pro Se* Defendant, Karl L. Malloy ("Debtor" or "Defendant"), and in

compliance with the direction of the Court by Scheduling Order, entered August 23, 2024,

Debtor requests rejection of the pre-petition Purchase Agreement and rejection of the pre-petition

Bill of Sale (the "Purchase Agreement" and the "Bill of Sale" hereafter referred to as the

"Contract") between Debtor and Creditors, Kristin E. Schelin and Mark A. Watson ("Creditors"

or "Plaintiffs"), pursuant to section 365 of Title 11 of the United States Code. Defendant opposes

any award to Plaintiffs of any damages, including but not limited to any compensatory, resulting,

and related damages, for any amounts incurred or paid by Creditors. Defendant opposes any

award of prejudgment interest thereon and opposes any award of tax liabilities accruing to

Plaintiffs. Defendant objects to the types of damages alleged by Plaintiffs and the amounts of

such alleged damages, including but not limited to the (i) "Increased First Loan Interest

Expense" in the amount of $539,866.50; (ii) "Roof repair" in the amount of $43,536.10; (iii)

"Increased cost of restoring property" in the amount of $50,998.55; (iv) "New conditions and

damages" in the amount of $45,950.00; (v) "Increased costs to perform planned repairs" in the

amount of $42,416.00; (vi) "Attorney's Fees and Costs" in the amount of $357,819.19; (vii)

"Expert Fees and Costs" in the amount of $18,118.00; (viii) "Loan fees and costs for financing

Plaintiffs' costs of this litigation" in the amount of $2,003.67; (ix) "Inspection Fees and Costs" in

the amount of $8,500.00; (x) "Termite Treatment and Repair" in the amount of "TBD per walk

through"; (xi) "Diminution in appraised value" in the amount of $30,000; (xii) "Storage costs for

personal property" in the amount of $9,115.60; and (xiii) "Tax consequences and tax liabilities

for Plaintiffs" in the amount of $431,651.62 (or some other adjusted amount), or any other

amounts alleged by Plaintiffs.

1.  Defendant objects to the award of any damages to Plaintiffs upon the grounds set

forth in Defendant's Motion to Stay and Refer Parties to Mediation filed in Powhatan County

Circuit Court and this Court; Defendant's Plea in Bar filed in Powhatan County Circuit Court

and in this Court; Defendant's Demurrer filed in Powhatan County Circuit Court and in the

Court; Defendant's Answer filed in Powhatan County Circuit Court and in this Court;

Defendant's Affirmative Defenses filed in Powhatan County Circuit Court and in this Court;

Defendant's Counterclaim filed in Powhatan County Circuit Court and in this Court; Defendant's

Motion for Reconsideration filed in Powhatan County Circuit Court and in this Court;

Defendant's Response in Opposition to Plaintiffs' Memorandum of Damages at Trial filed as

Exhibit 104; Defendant's Response in Opposition to Plaintiffs' Motion to Conform Pleadings to

the Evidence or for Leave to Amend Ad Damnum Clause and Incorporated Memorandum of

Law filed as Exhibit 106; records of these proceedings and the proceedings of Adversary

Proceeding 23-03043-KRH, including Defendant's arguments at hearings; and for the reasons

stated herein.

### Rejection of Contract Pursuant to Section 365 of Title 11 of the United States Code

2.      Section 365(a) of the Bankruptcy Code provides that, subject to certain limitations

that do not apply to this case "the trustee, subject to the court's approval, may assume or reject

any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365

3.      Thus, the Court's initial inquiry should be whether Debtor and Creditors are

parties to an agreement that is executory under section 365 of the Bankruptcy Code. The Third

Circuit has defined an executory contract as "a contract under which the obligation of both the

bankrupt and the other party to the contract are so far unperformed that the failure of either to

complete performance would constitute a material breach excusing performance of the other." *In

re Columbia Gas Sys. Inc.*, 50 F.3d 233, 239 (3d Cir. 1995) (citing *Sharon Steel Corp. v. Nat'l

Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir.1989) ).

4.      The appropriate time to test whether a contract is executory is the petition

date. Id. at 240. Under this definition, a court must first determine that there was a contract

between the parties, and if so, whether that contract was so far unperformed, as of the petition

date, that the failure to perform the remaining obligations would be a material breach of said

contract.

5.      Defendant believes that the Contract terminated by its own terms on March 21,

2022; however, the Judge Cella of the Powhatan County Circuit Court does not seem to share

Debtor's belief in this regard.

6.     Even so, in this case, no state court order for specific performance has been entered. There does not exist a pre-petition state court order for specific performance or pre-petition decree for specific performance. Therefore, there is no state court order for specific performance or decree of specific performance that impacts the rejection of the Contract pursuant to Section 365 of Title 11 of the United States Code.

7.     Assuming for purposes of rejection that the Contract did not terminate by its own terms, the Debtor and the Creditors still have material obligations under the Contract which renders the Contract executory under the Countryman definition. See In re Pribonic 70 B.R. 596 (Bankr. W.D. Pa. 1987), 601.

8.     Creditors still need to seek financing to pay for the Property; certain inspections may need to be conducted; a deed of conveyance will need to be prepared; title insurance will need to be secured, etc. All the usual activities associated with the sale and purchase of property need to occur if the sale of the Property is to commence again after a more than two-hear hiatus. Therefore, Debtor and Creditors still have material obligations under the Contract if the Contract is still in existence which renders the Contract executory if it is still in existence.

*Ad Damnum Clause*

9.     Virginia Supreme Court Rule 3:2(c)(ii) states, in part, "[e]very complaint requesting an award of money damages must contain an *ad damnum* clause stating the amount of damages sought." (emphasis added)

10.     Virginia law requires that the plaintiff plead a specific amount.

11.     It is black letter law that a plaintiff may not recover more than he demands in his Complaint. *Lee v. Spoden*, 290 Va. 235, 253 (2015).

12.    This rule applies to claims for compensatory and punitive damages. *See Town &*
*Country Properties v. Riggins*, 249 Va. 387, 399-400 (1995) (the trial court erred in refusing to
reduce the punitive damage award to conform to the *ad damnum*).

13.    As a threshold matter, the Complaint, filed by Plaintiffs, Kristin E. Schelin and
Mark A. Watson, by and through counsel, on March 25, 2022, in the County of Powhatan Circuit
Court does not contain an *ad damnum* clause stating a specific amount sought.

14.    Plaintiffs have failed to mitigate any damages by instituting litigation, opposing
mediation, and refusing to purchase the Property for the originally agreed upon price of
$930,000.

15.    If this Court concludes that the Complaint does contain an *ad damnum* clause, any
*ad damnum* clause in the Complaint is improper, as it does not contain a specific amount plead
by Plaintiffs.

16.    The Court must not award damages above $0.00.

17.    Again, any *ad damnum* clause in the Complaint is improper as it does not contain
a specific amount plead by Plaintiffs.

18.    The Rules of the Virginia Supreme Court clearly state that the plaintiff must
provide "the *amount* of damages requests" in the Complaint. Va. Sup. Ct. Rule 3:2(c)(ii)
(emphasis added).

19.    Not only does Merriam Webster define "amount" as the "the total number or
quantity," Merriam Webster Dictionary, June 12, 2024, https://www.merriam-
webster.com/dictionary/amount, but Virginia Circuit Courts have previously held the same. *See*
*EER Sys. Corp. v. Armfield, Harrison & Thomas, Inc.*, 51 Va. Cir. 84, 99 (Va. Cir. 1999) ("In

Virginia, contrary to Federal practice, the motion for judgement must contain an ad damnum that quantifies the monetary damages sought. This is because the ad damnum sets a cap on the amount recoverable by the plaintiff.") Stating "in excess of" does not state an *amount*, it does not provide a total number or quantity, nor even a specific *range*, but rather a *floor*.

20.    In Virginia, the pleadings remain critical throughout the entirety of a case.

21.    The "issues in a case are made by the pleadings, and not by the testimony of witnesses or other evidence." *Dabney v. Augusta Mut. Ins. Co*, 282 Va 78, 86 (2011).

22.    In fact, no judgement can be entered on "a right not pleaded and claimed," nor under a theory of liability not articulated in the pleadings. *Sloan v. Thornton*, 249 Va. 491, 500 (1995).

23.    This binding effect of the pleadings includes an *ad damnum* clause.

24.    A plaintiff cannot ask the jury to award an amount in excess of that requested in the complaint. *Smith v. McLaughlin*, 289 Va. 241, 270 (2015).

25.    Further, when an *ad damnum* is properly pled, a remitter is warranted when the plaintiff receives more than the amount requested in the pleadings. *Powell v. Sears, Roebuck & Co.*, 231 Va. 464, 470 (1986).

26.    In this case, to the extent the Complaint contains an *ad damnum* clause, the *ad damnum* clause is improper because it fails to state a specific "amount".

27.    Accordingly, any award to the Plaintiffs should not exceed that which is readily ascertainable from the initial filing which is $0.00 based on the filing fee paid for the Complaint, the Cover Sheet for Filing Civil Actions, the Powhatan Circuit Court Fee Schedule, and the fact that the Complaint does not contain a specific amount plead by Plaintiffs.

*Failure to Mitigate Damages*

28.     The Plaintiffs have a duty to minimize damages.

29.     If damages are greater than if Plaintiffs had acted to minimize then they cannot recover the amount by which they were increased.

30.     The duty to minimize begins when Plaintiffs knew or should have known of any breach.

31.     In determining contract damages, those damages are fixed as of the date of the breach. *United Virginia Bank v. Ford*, 215 Va. 373, 375 (1974).

32.     Defendant still maintains, as stated in Defendant's Counterclaim, that Plaintiffs breached the Contract for the sale of the property located at 1600 Mill Quarter Road, Powhatan, Virginia 23139 (the "Property").

33.     Plaintiffs should not be allowed to profit from their own breach.

34.     Plaintiffs opposed mediation; this case could have been settled through mediation more than two years ago.

35.     Plaintiffs opposed reasonable efforts to settle, including purchasing the Property at the original purchase price of $930,000.

36.     Plaintiffs have even refused Defendant's offer of Seller/Owner financing at 4.125%.

37.     Plaintiffs have failed to mitigate their damages and have unfairly, unjustly, and maliciously dragged *Pro Se* Defendant through a trial process for the past two years.

*Direct and Consequential Damages*

38.     There are two broad categories of damages *ex contractu*: direct (or general) damages and consequential (or special) damages. <u>Washington & Old Dominion R.R. Co. v. Westinghouse Co.</u>, 120 Va. 620, 627, 89 S.E. 131, 133 (1916).

39.     Direct damages are those which arise 'naturally' or 'ordinarily' from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach.

40.     Consequential damages are those which arise from the intervention of 'special circumstances' not ordinarily predictable. If damages are determined to be consequential, they are compensable only if it is determined that the special circumstances were within the 'contemplation' of both contracting parties.

41.     "Consequential damages are recoverable, in action for breach of contract, only if it is determined as matter of fact that special circumstances were within contemplation of contracting parties at time of contracting; "contemplation" includes both that which was actually foreseen and that which was reasonably foreseeable." <u>Richmond Med. Supply Co. v. Clifton</u>, 235 Va. 584, 369 S.E.2d 407 (1988).

42.     If damages are determined to be direct, they are compensable.

43.     Whether damages are direct or consequential is a question of law. Whether special circumstances were within the contemplation of the parties is a question of fact. 5 A. Corbin, <u>Contracts</u> § 1012(89) (1964); C. McCormick, Damages s 140 (574) (1935); <u>See</u> <u>Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.</u>, 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975).

44.     Defendant objects to the types of damages alleged by Plaintiffs and the amounts of such alleged damages, including but not limited to the (i) "Increased First Loan Interest

Expense" in the amount of $539,866.50; (ii) "Roof repair" in the amount of $43,546.10; (iii) "Increased cost of restoring property" in the amount of $50,998.55; (iv) "New conditions and damages" in the amount of $45,950.00; (v) "Increased costs to perform planned repairs" in the amount of $42,416.00; (vi) "Loan fees and costs for financing Plaintiffs' costs of this litigation" in the amount of $2,003.67; (vii) "Termite Treatment and Repair" in the amount of "TBD per walk through"; (viii) "Diminution in appraised value" in the amount of $30,000; (ix) "Storage costs for personal property" in the amount of $9,115.60; and (x) "Tax consequences and tax liabilities for Plaintiffs" in the amount of $431,651.62 (or some other adjusted amount) as these aforementioned alleged damages, if they in fact exist, arose from the intervention of 'special circumstances' not ordinarily predictable and were not within the 'contemplation' of both contracting parties, were not actually foreseen by both contracting parties, and were not reasonably foreseeable by both contracting parties.

*Interest Rate Damages*

45.    Plaintiffs are under a general duty to mitigate damages on a claim of interest rate damages.

46.    Any award of interest rate damages should be reduced to its present value.

47.    Also, "the likely true life of the promised mortgage" that Plaintiffs are forced to enter into because of any breach should be taken into account when computing interest increase damages.

48.    Absent here is proof that the parties claiming interest increase damages have entered into a new contract for the purchase of a home or that at a minimum they were likely to enter into such a transaction in the near future.

49.     Indeed, such proof is so vital to a claimant's successful recovery that without such a showing, "any economic damages are remote and speculative."

50.     Comparing the aborted loan commitment with the one that the Plaintiffs are forced to enter into because of any breach, the trial court can fashion an award which would initially reflect the measure of damages suffered by the Plaintiffs; however, in this instance, to the best of Defendant's knowledge, the Plaintiffs have not obtained any new mortgage loan commitment and have not entered into any new contract to purchase another property.

51.     There exists the potential for abuse by Plaintiffs who have unduly prolonged their search for a new home until interest rates have risen or alternatively, has not searched in the housing market at all.

52.     In either case, the party claiming injury from the breach of the original real estate contract has not conformed to his general duty to mitigate damages, and if a significant delay has occurred, damages may well be "remote and speculative."

53.     In this case, Plaintiffs refused to purchase the Property for the original agreed upon price, refused to purchase the Property after the originally scheduled closing date, and opposed Defendant's mediation and settlement attempts.

54.     Plaintiffs unnecessarily delayed their subsequent loan search and to the extent that a comparable loan commitment could have been entered into prior to any intervening rises in interest rates, the trier of fact can adjust the award to reflect the actual harm caused by any breach.

55.     Plaintiffs have not entered into a new home financing agreement and it is not likely to do so in the near future.

56.     Since this type of award reflects an amount which the Plaintiffs would suffer prospectively, reducing it to its present worth would ensure that the Plaintiffs are not overcompensated by receiving the lump sum of their total damages which could be invested immediately, thereby enabling them to receive windfall profits on money that was supposedly a reflection of their future losses.

57.     The United States Supreme Court stated that: "[i]t is self-evident that a given sum of money in hand is worth more than the like sum of money payable in the future." *See Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485 (1916).

58.     Many homeowners do not own one home for the full term of the mortgage loan commitment.

59.     Any interest increase award should also represent the likely true life of the promised mortgage.

60.     This reasoning is sound because it also attempts to avoid overcompensating any injured plaintiff.

61.     Assume, for example, that a plaintiff was subjected to interest increase costs resulting in monthly mortgage payments of $100 more than would have been required under the first loan commitment which was lost due to any breach.

62.     If the term of the mortgage was thirty years, it appears that the Plaintiffs would be entitled to recover a lump sum representing the increased monthly payments for the full term.

63.     If it is further presumed, however, that ten years into the loan commitment, Plaintiffs prepay the loan in full or sell to a third party who assumes the existing mortgage, they

have then been compensated for twenty years' worth of interest increase costs that in actuality never materialized.

64.     It is this windfall profit that this Court should be cognizant in formulating any damage award.

65.     Although this standard appears to represent the best interests of both parties concerning any breached contract, in application, it is too speculative.

66.     Simply put, how is the "likely true life" of a particular mortgage computed?

67.     It is a recognized fact in the savings and loan industry that most mortgages are fulfilled before their date of maturity.

68.     There is a general assumption throughout the industry that the average true life of a mortgage is eight years, but this figure may be somewhat inflated.

69.     Statistical compilations on the average life of a mortgage show that a variety of mortgages are aggregated to compute an average, yet, these composites do not differentiate between certain characteristics which most certainly will affect the accuracy of a median life of a mortgage.

70.     One characteristic which will have a large impact on the average life of a mortgage is the mortgage interest rate and yet, mortgages with low interest rates are averaged with mortgages bearing high interest rates without differentiating between the possible effects each may have on prepayment tendencies.

71.     An alternative method of compensation of an interest increase award is to authorize periodic payments on either a monthly or annual basis.

72.     If the parties were allowed to adjust payments as their positions changed, such a method of compensation would eradicate the possibility of the Plaintiffs being overcompensated.

73.     If Plaintiffs refinanced when interest rates declined, the parties may alter payments accordingly.

74.     If Plaintiffs sold the home, the parties may terminate payments.

75.     Another alternative formulation for awarding interest increase damages is the award of an amount equal to a single payment which could be used to purchase an annuity by a home purchaser who suffered interest increase damages.

76.     This award, if invested in an annuity, would guarantee a monthly payment from an insurance company which would be equal to the differential between what the plaintiff would have paid under the lapsed loan commitment and what he was subsequently forced to pay for a new mortgage because of any breach of contract.

77.     Under this approach, the court directs the Defendant to purchase an annuity with a fixed term relative to the full duration of the mortgage, rather than award the Plaintiffs the cost of such an annuity.

78.     To avoid overcompensating the Plaintiffs, the terms of the annuity would provide for a type of reverter clause, whereby the annuity would automatically be reassigned to the Defendant party upon sale of the Property or prepayment of the mortgage.

79.     Additionally, it is suggested that the Plaintiffs receiving the differential provided by this type of annuity should be required to refinance the mortgage if interest rates recede to a point where this becomes reasonable.

80.    Refinancing may partially or totally eliminate the difference in mortgage costs for which any breaching party is liable.

81.    If this is the case, the parties could adjust the annuity payments accordingly.

82.    Furthermore, the courts or the parties themselves can determine a minimum figure to which interest rates must decline before refinancing would be required.

83.    In *Roanoke Hospital Association v. Doyle & Russell, Inc.,* 127 the Virginia Supreme Court held that increased interest costs caused by delays in construction must be considered consequential damages.

84.    Noting that it was not the construction delays which caused the increase in interest rates, but rather unpredictable pressures in a volatile money market, the court concluded that "increases in interest rates are 'special circumstances,' and damages resulting therefrom are consequential and not compensable unless such circumstances were within the contemplation of the parties. *See Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.,* 215 Va. 796, 803, 214 S.E.2d 155, 161 (1975) ("damages resulting from increased interest rates are not direct damages").

85.    Plaintiffs might be limited to recover an amount which represents the interest increase which occurred within a reasonable time after the contract was breached rather than recover an amount which represents the difference between the broken loan commitment and the contemplated mortgage after interest increases reach a peak level.

86.    Plaintiffs seemingly have made no attempt to search for a similar house and obtain a new loan commitment to finance the home's purchase; several unique, historical homes have been for sale according to Plaintiffs appraisal for the Property; there should be no injury

due to interest increase and ultimately, no basis for such a recovery, because Plaintiffs failed to mitigate their damages.

87.    The increase in interest rates to which any home purchaser is subjected cannot be the direct result of a real estate vendor's breach of contract.

88.    Home mortgage interest rate increases result from a number of variables affecting the economy, primary among which are corresponding rises in inflation rates and the cost of purchasing a home.

89.    Another factor affecting mortgage interest rates is that many lending institutions have retained in their portfolios long-term loans at pre-inflation interest rates.

90.    The low rate of return from these loans makes it difficult to offset the short-term obligations to customers who invest in savings accounts which yield higher interest rates.

91.    A home purchaser who takes out a mortgage for 6.25% today, can be seen as subsidizing the home purchaser of yesterday who has a low mortgage interest rate which still remains in the lending institution's portfolio.

92.    Therefore, the injury suffered by a home buyer subjected to a vendor's breach of the contract for sale, could not be that which arises naturally or "according to the usual course of things" when a contract is breached, but rather that caused by special circumstances which must be in the contemplation of the parties at the time of contracting before recovery is allowed, i.e., consequential damages.

93.    The law of contract does not allow a speculative damage award for interest and fees which may never be incurred.

94.    It would be supremely unjust to find that the increase in interest rates is a foreseeable consequence of any breach of the Contract.

95.    The Contract contains no clause supporting an award of such speculative and unforeseen damages in the event of any breach.

96.    Plaintiffs' calculations of these damages is both unreasonable and mathematically unsound.

97.    Plaintiffs' request for damages should be denied.

98.    Nothing in the Contract prevents the plaintiffs from flipping the property for a quick profit or financing or refinancing the Property at any particular rate, both of which would eliminate any damage exposure based on an increase in interest rates.

99.    The Contract contains no clause disclosing and/or restricting the Plaintiffs in terms of the length of time they intend to hold the Property.

100.    No clause in the Contract shifts the buyer's risk of increase in interest rates to the seller in the event of any breach.

101.    Plaintiffs' damages claim for "increased first loan interest expense" focuses specifically upon money Plaintiffs have not yet paid (and perhaps will never pay).

102.    In fact, Plaintiffs have not secured any mortgage to purchase the Property.

103.    Plaintiffs have not presently incurred a single penny of the damages they are predicting they may incur on an incremental basis extending 30 years into the future.

104.    The bulk of said damages, mortgage interest, will be entirely avoided if Plaintiffs choose to flip the property, or partially avoided if they sell or refinance in the next 30 years.

105.    Importantly, Defendant offered to sell the Property to Plaintiffs through owner/seller financing at an interest rate of 4.125%, the interest rate that Plaintiffs allege they had secured in March 2022.

106.    However, Plaintiffs, as recently as June 2024, declined Defendant's owner/seller financing at 4.125%.

107.    Defendant even offered to sell the Property to the Plaintiffs for $500,000 to settle all claims to end this horrific process; Plaintiffs refused the settlement offer.

108.    In the present case no provision in the Contract sets forth that the seller will indemnify buyer for changes in the interest rates available to buyer as a result of any breach or delay.

109.    Such language could have been contained in the Contract, but it wasn't negotiated or bargained for.

110.    Consequences such as dramatically higher interest rates do not flow from the delay or breach of the Contract.

111.    Interest rates go up and down based on the benchmark set by the Federal Reserve as a result of fluctuations in our economy.

112.    These economic fluctuations are not a foreseeable and predictable consequence of the delay or breach of the Contract to purchase the Property.

113.    If the Plaintiffs and Defendant had foreseen such events, and wished to make provisions in the offer to protect themselves from an increase in interest rates in the event of delay or breach, they could have done so.

114.    Plaintiffs chose not to include such specific language in the offer they tendered to the Defendant, probably because interest rates rising from "historical lows" to the current levels was then unforeseen.

115.    Notably, the Contract states that the sale is subject to financing at the "prevailing rate of interest at settlement".

116.    Plaintiffs could have chosen to make the Contract contingent on a fixed interest rate or a not to exceed interest rate; however, Plaintiffs chose to make the Contract subject to financing at the "prevailing interest rate at settlement".

117.    Such interest damages alleged by Plaintiffs are also wholly speculative in that no mortgage loan has been currently obtained by Plaintiffs at any rate of interest.

118.    This unknown factor requires the court to speculate on what that the new interest rate will be, whether points or other discounts might be available, when the Plaintiffs might sell the Property, the ability of the Plaintiffs to refinance, the number of the mortgage payments the Plaintiffs will likely make, etc.

119.    The Plaintiffs' claimed impediments to finance (or refinance) appear to be personal circumstances that could have been addressed in the Contract, but they aren't; instead, Plaintiffs chose to make the Contract subject to financing at the "prevailing interest rate at settlement".

120.    Plaintiffs' expert analysis doesn't account for the payment of points (pre-paid interest) that are paid at the onset of the loan.

121.    Contrary to Plaintiffs' and Plaintiffs' experts assertion that market interest rates for 30 year conforming loans are 7.625% and 7.875%, the current 30 year fixed rate conforming mortgage being offered by Wells Fargo is at 6.25%.

122.    Wells Fargo is located in the Village of Powhatan a few blocks from the Powhatan County Circuit Court; the Court can easily take judicial notice of the interest rate for a 30 year conforming fixed rate mortgage by walking into any Wells Fargo branch.

123.    Additionally, Plaintiffs can purchase discount points to further reduce the interest rate.

124.    A discount point is typically equivalent to 25 bps of a mortgage interest rate; four (4) discount points would result in a 100 bps reduction in a mortgage interest rate; the cost of a discount point is typically 1% of the mortgage amount; therefore, a discount point on a $647,000 mortgage would cost approximately $6,470 and the cost for four (4) discount points would cost approximately $25,880.

125.    In theory, Plaintiffs would need to purchase approximately nine (9) discount points to lower the 6.25% interest rate to 4.125% at a cost of $58,230.

126.    Plaintiffs have a duty to mitigate their damages and should not be granted a financial windfall.

127.    The Plaintiffs could also avoid such alleged damages entirely by flipping the house or financing, now or down the road, at a lower rate or sooner in time than that assumed by Plaintiffs' experts.

128.    Plaintiffs could also accept Defendant's owner/seller financing at 4.125% on a purchase price of $930,000 subject to the terms proposed to Plaintiffs.

129.     These are only a few of the many avenues available to Plaintiffs (and entirely within their control) to reduce or eliminate the interest paid over the life of the loan, despite current rates.

130.     Until a mortgage loan is obtained and paid on by Plaintiffs, Plaintiffs have not incurred one penny of these entirely theoretical and speculative damages.

131.     The usual rule for damages in a breach of contract case is that the injured party should be put in the position they would have been in had the contact been performed. See, e.g., Restatement (Second) of Contracts s. 344 (1979).

132.     However, the law of contracts is intended to give an injured party the benefit of the bargain, not the benefit of the bargain and a windfall.

133.     Possible financial loss or expenses claimed by a plaintiff that are contingent upon a future occurrence, purely conjectural, or highly improbable, are known as speculative damages.

134.     Courts generally do not award speculative damages.

135.     The Supreme Court of Virginia has held that damages must be proved with reasonable certainty and not be speculative, contingent, or uncertain. *Sunrise Continuing Care, LLC v. Wright,* 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009).

136.     Plaintiffs' damages claims are speculative.

137.     The usual measure of monetary damages for breach of a purchase and sale agreement or offer to purchase is the difference between the contract price and the fair market value of the land as of the date of the conveyance was to occur.

138.     This "usual rule" is not a rigid rule, but nevertheless remains as the standard measure of damages specific to a breach of a real estate purchase contract.

139.   Plaintiffs contend that the appraised value of the Property was $930,000 in March 2022 and $900,000 in February 2024, a reduction of $30,000.

140.   Defendant asserts that the Powhatan County tax assessed value for the Property in March 2022 was $1,100,700 and the Powhatan County tax assessed value for the Property in February 2024 was $1,200,500, an increase of $99,800.

141.   Plaintiffs might have been entitled to such non speculative legal damages in lieu of specific performance.

142.   Plaintiffs bear the burden of proof, and they failed to put forth any expert witness or other proof on the standard measure of damages in a breach of contract to purchase real estate.

143.   The rule of damages in an action for breach of contract is that the plaintiff is entitled in general to damages sufficient in amount to compensate him for the loss actually sustained by him, and to put him in as good position financially as he would have been in if there had been no breach.

144.   Plaintiffs may not insist upon extraordinary or unforeseen elements of damage, but only such as flow according to common understanding as the natural and probable consequences of the breach and such as may be presumed to have been in the contemplation of the parties at the time the contract was made.

145.   Damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty.

146.   In calculating damages, the buyer must not be overcompensated.

147.   Plaintiffs are not entitled to speculative contract damages in addition to specific performance.

148.    While the Plaintiffs may be entitled to initiate two separate claims for specific

performance and damages, the plaintiffs are only permitted to recover on one of those actions.

See Restatement (Second) of Contracts § 378 comment d, at 230 (1981) ("the remedy of specific

performance . . . and that of damages for total breach of contract are inconsistent").

149.    An award for specific performance is not an award for damages; it is a remedy at

equity that is an alternative to damages. An additional award of interest and other damages is not

available.

150.    In this case, the Plaintiffs' claim is for specific performance of a Contract for the

sale of real estate, not a lease contract.

151.    Allowing Plaintiffs' claims for speculative and consequential damages, in

addition to specific performance, would award the plaintiffs much more than either that to which

they are legally entitled and that which Plaintiffs bargained for as expressed by Contract.

152.    The language in the Contract for the sale of the Property does not provide for

damages in the event of an unforeseen rise in interest rates.

153.    To the contrary, Plaintiffs conditioned the sale on financing at the "prevailing rate

of interest at settlement".

154.    Damages must have been reasonably foreseeable as a natural and probable result

of a breach of contract at the time the contract was made.

155.    Recoverable damages must originate from a probable consequence of the breach

of contract and therefore be "within the contemplation of the parties" during formation.

156.    The sudden rise in interest rates from "historical lows" was not contemplated,

foreseen or bargained for by anyone in this matter.

157.    The damages sought by Plaintiffs are not natural, not probable, and not reasonably foreseeable when that standard is applied to the specific facts of this case.

158.    Plaintiffs' expert's calculations and analysis regarding interest damages is unreasonable and runs contrary to basic math.

159.    There is no basis or necessity for the Plaintiffs' complicated extrapolation based on a variety of undetermined factors extending over the next thirty years.

160.    Plaintiffs' expert's estimation is unreasonable, speculative, and mathematically unsound.

161.    A more reasonable and mathematically sound measure of calculation of any interest rate damages would be to take the interest payments on a 30 year amortizing loan and discount each payment to present value.

162.    No expert witness is needed by the Defendant to impeach Plaintiffs' expert in this regard, just basic math.

163.    Plaintiffs have cited virtually no legal authority in support of its request for damages in terms of types of damages and amount of damages.

164.    This is a simple contract dispute which has resulted in irreparable damage to the Defendant.

165.    Plaintiffs want Defendant's home for free.

166.    Plaintiffs and Plaintiffs' counsel should not be rewarded for their bad faith, *fraudulent*, wanton, willful, vexatious, harassing, and oppressive conduct.

167.    Plaintiffs and Plaintiffs' counsel should not be rewarded with windfall of speculative damages they may never incur, and which are wholly avoidable.

*Tax Consequences*

168.    Plaintiffs making claims for tax damages must meet a difficult burden of proof.

169.    For example, in *DCD Programs, Ltd.* v *Leighton* (9th Cir 1996) 90 F3d 1442, the court denied a claim for tax damages, noting that everyone must pay taxes, and that taxes are imposed by the Internal Revenue Code, not by the wrongful conduct of the defendant.

170.    The same reasoning appears in *Thomas* v *Cleary* (Alaska Sup Ct 1989) 768 P2d 1090, in which the court noted that plaintiffs are "under a legal duty to pay taxes." See also *Alpert* v *Shea Gould Climenko & Casey* (NY Sup Ct 1990) 559 NYS2d 312 (investors were not allowed to recover taxes paid to IRS after deductions attributable to their investment were disallowed).

171.    When taxes would be payable by the plaintiff irrespective of the defendant's conduct, a tax claim against the defendant may seem spurious. However, it is often not clear whether taxes would be payable (and, if so, in what amount) if not for the defendant's conduct. This can lead to complex calculations and alternative positions, which some courts have viewed as speculative.

172.    The tax reporting positions Plaintiffs take when taxes are due may be entirely inconsistent with the tax postures they took during litigation.

173.    Plaintiffs ask for a tax gross-up now based on one set of assumptions, but will likely take a different tax-return reporting position.

174.    Plaintiffs calculate taxes based on the entire judgement being taxed at ordinary income rates.

175.    These same Plaintiffs are likely to take the position on their tax return that the

recovery is capital gain or even a recovery of basis.

176.    This may sound duplicitous, but the way in which a judgement will be taxed is

often complex and may involve difficult factual and legal judgments.

177.    Plaintiffs are currently making pessimistic tax assumptions about how the

judgement will be taxed.

178.    These same Plaintiffs are likely to take a more aggressive tax return posture when

taxes are due.

179.    It is inevitable that a court facing claims for taxes as an item of damages will need

to determine what taxes are payable.

180.    This can be complicated and may account for the frustration courts express when

they discuss tax issues.

181.    It is important to note that Plaintiffs did not disclose to Defendant at the time of

contracting or at any time prior to May 21, 2024 the Plaintiffs' tax position.

182.    In fact, Plaintiffs, by and through counsel, requested that the Powhatan County

Circuit Court prohibit Defendant from requesting income information from the Plaintiffs.

183.    Any award of tax consequences was not contemplated by the parties at the time of

entering into the Contract for the sale of real property.

184.    In *Carter* v *Sedgwick Co.* (10th Cir 1954) 36 F3d 952, the court took a proactive

approach, attempting to insulate the plaintiff from tax liability on the attorney fees by making the

fee award payable directly to counsel, and by explaining the nature of the award clearly so the

plaintiff and his tax advisor could refer to the explanation when preparing income tax returns.

Presumably, the court also hoped that the IRS would consider the explanation before attempting to impose a tax on the plaintiff for the attorney fees award.

185.    For payments received in settlement of a lawsuit, payments by the one causing a loss that do no more than restore a taxpayer to the position he or she was in before the loss was incurred are not includible in gross income because there is no economic gain to the recipient.

186.    If a recovery is treated as a replacement of capital, the damages received from the lawsuit are treated as a return of capital and are taxable only to the extent that the damages exceed the basis of the property replaced). *Raytheon Products Corp. v. Commissioner,* 144 F.2d 110 (1st. Cir. 1944), cert. denied, 323 U.S. 779 (1944).

187.    *Rev. Rul. 81-277, 1981-2 C.B. 14* states "[t]he determination of whether the proceeds received in a lawsuit or received in settlement of a lawsuit constitute income under section 61 of the Code depends on the nature of the claim and the actual basis for recovery. If the recovery represents damages for lost profits, it is taxed as ordinary income. If, however, the recovery is treated as a replacement of capital, the damages received from the lawsuit are treated as a return of capital and are not taxable as income." *Id.* at 3-4.

188.    The ruling holds that because the taxpayer received no economic gain as a result of the estimated cost payment and was merely made whole under the contract, the payment was a return of capital, reducing the taxpayer's basis in the property.

189.    The other type of return of capital that is not taxable is the return of tax basis.

190.    Generally, one only pays income tax on the gain on the sale of the property.

191.    The gain is computed by taking the sales proceeds less the tax basis in the property.

Tax basis is generally the capital investment or outlay to acquire and improve the property.

192. Then the tax basis is the original purchase price plus the cost of improvements.

193. Recovery of capital is not income and proceeds that represent compensation for lost value or capital are generally not taxable.

194. Whether a payment received in settlement of a claim represents a recovery of capital depends on the nature of the claims that were the basis for the settlement.

195. To determine whether a settlement or judgement represents lost value, one has to consider, "in lieu of what was the settlement awarded?"

196. The nature of the claim is typically determined by looking at the settlement agreement or judgement, focusing on the origin and characteristics of the claims settled.

197. Should the underlying agreement or judgment not answer the question, one has to inquire as to the intent of the payor, taking into consideration all the facts and circumstances of the case.

198. In this case, Plaintiffs are claiming loss in value of the Property. IRS Publication 4345 is support.

199. Property settlements or judgements for loss in value of property that are less than the adjusted basis of your property are not taxable and generally do not need to be reported on your tax return. However, you must reduce your basis in the property by the amount of the settlement or judgement.

200. If the property settlement or judgement exceeds your adjusted basis in the property, the excess is income.

201.    In general, the proper tax treatment of a recovery or payment from a settlement or judgment is determined by the origin of the claim. In applying the origin-of-the-claim test, some courts have asked the question "In lieu of what were the damages awarded?" to determine the proper characterization (see, e.g., *Raytheon Prod. Corp.*, 144 F.2d 110 (1st Cir. 1944)).

202.    For a recipient of a settlement or judgement amount, the origin-of-the-claim test determines whether the payment is taxable or nontaxable and, if taxable, whether ordinary or capital gain treatment is appropriate.

203.    In general, damages received as a result of a settlement or judgment are taxable to the recipient. However, certain damages may be excludable from income if they represent, for example, gifts or inheritances, certain disaster relief payments, amounts for which the taxpayer previously received no tax benefit, cost reimbursements, recovery of capital, or purchase price adjustments.

204.    Damages generally are taxable as ordinary income if the payment relates to a claim for lost profits, but they may be characterized as capital gain (to the extent the damages exceed basis) if the underlying claim is for damage to a capital asset.

205.    In this case, Plaintiffs presumably are being asked to be restored to the position they were allegedly in as of March 2022.

206.    The sketch final judgement prepared by Plaintiffs' counsel uses the phrases "amounts incurred or paid by Plaintiffs" and "sustained by Plaintiffs" to describe any damages.

207.    Any damages awarded to Plaintiffs should result in a return of capital and/or a reduction in basis and should not result in an economic gain to the Plaintiffs.

208:    Consequently, there should not be any gross-up for tax consequences of an award

of damages to Plaintiffs as the receipt of requested damages would likely result in only a return

of capital and/or a reduction in basis.

*Alleged Increased Cost of Restoring Property and Alleged New Conditions*

209.    The cost estimates provided by Plaintiffs' and Plaintiffs' expert are too

speculative, vague, and uncertain to be given any weight.

210.    The range of repair estimates vary so drastically, from $10,000 to $40,000 for a

single repair. Such wide variances are too uncertain to be awarded damages.

211.    Additionally, the scope of Plaintiffs' inspections was greater and more detailed

that in 2022.

212.    Therefore, it is not prudent to conclude that a variance from the report in 2022 to

2024 is a new or incremental damage that should be paid by Defendant.

*Alleged Attorney's Fees and Costs*

213.    Attorneys' Fees and Costs of $357,819.19 are simply not reasonable and should

not be allowed.

214.    Plaintiffs' counsel has not been truthful to the Court on multiple occasions.

215.    While the Court may turn its gaze from Plaintiffs' counsel's dishonesty,

Defendant has been traumatized by it.

216.    Plaintiffs' counsel's dishonesty and aggressiveness has caused Defendant much

anguish over these more than two years.

217.    Plaintiffs' counsel's conduct has been in bad faith, *fraudulent*, wanton, willful,

vexatious, harassing, and oppressive.

218.    The fact that Plaintiffs' counsel engaged his former business Partner to provide

expert testimony as to the reasonableness of this patently unreasonable request for attorneys' fees

and costs is telling.

219.    Additionally, Plaintiffs' expert testified to the $290,574.89 but did not testify to

the second request for $67,244.30 which was incurred in just ten (10) business days. That's a

shocking amount to request; even if Mr. Mrtyetus billed that by himself, that would amount to

more than 138 hours billed in ten (10) business days, which averages about fourteen (14) hours

per day on this matter, which is not very realistic.

220.    Something is amiss with Plaintiffs' counsel's billing.

221.    This Court should require a review of all of Plaintiffs' counsel's billing invoices

prior to the award of any attorneys' fees in this matter.

222.    Defendant hereby requests that the Court order Plaintiffs' counsel to produce

copies of their time entries so that Defendant can review the same.

223.    Any award of damages for attorneys' fees and costs would likely be considered a

return of capital and/or a reduction in basis and should not result in an economic gain to

Plaintiffs.

224.    Consequently, any award of attorneys' fees and costs should not be grossed-up for
any alleged tax consequences for Plaintiffs.

Dated: October 10, 2024                    Respectfully submitted,

                                           Karl L. Malloy
                                           1600 Mill Quarter Road
                                           Powhatan, Virginia 23139
                                           Phone: (804) 528-1640
                                           Email: malloy@post.harvard.edu

                                           *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of October 2024, a true and correct copy of the

foregoing was sent by U.S. mail, postage prepaid to:

Christopher L. Perkins
Eckert Seamans Cherin & Mellott, LLC
919 E. Main Street, Suite 1300
Richmond, Virginia 23219

Carl M. Bates
Chapter 13 Trustee
P.O. Box 1819
Richmond, Virginia 23218

Michael T. Freeman
Assistant U.S. Trustee
1725 Duke Street, Suite 650
Alexandria, Virginia 22314

_____
Karl L. Malloy