**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

In re:  **KARL LINARD MALLOY,**                                  **Case No. 23-33442-KRH**
    **Debtor.**                                          **Chapter 7**

## <u>MEMORANDUM OPINION</u>

Before the Court is the *Trustee's Motion for Order Approving Proposed Settlement* [ECF No. 1070] (the "Motion") filed by William A. Broscious, the Chapter 7 trustee, (the "Trustee") for the bankruptcy estate (the "Estate") of Karl Linard Malloy ("Malloy" or the "Debtor").  The Motion seeks approval pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") of a settlement agreement (the "Settlement Agreement") concerning certain claims and interests by and between Mark A. Watson and Kristen E. Schelin (together, the "Creditors") and the Trustee on behalf of the Estate.  The Debtor is not a party to the settlement, nor does he need be.  The Trustee properly served the Motion and notice of the Motion on all necessary parties in accordance with Bankruptcy Rule 9019 and this Court's Local Bankruptcy Rules.  The Debtor is the only party in this bankruptcy case who has noted an objection to the proposed settlement.[1]  *See* Debtor's Obj. to Tr.'s Mot. for Ord. Approving Proposed Settlement, Obj. to Settlement Agreement, & Obj. to Proposed Ord. Approving Settlement Agreement, ECF No. 1087 (the "Objection").

On June 18, 2026, the Court conducted a lengthy evidentiary hearing (the "Hearing") on the Motion.  The Trustee and the Debtor each testified at the Hearing.  Based on the testimony of the witnesses, the other evidence admitted at the Hearing, the arguments of counsel and of the pro

---

[1]  Normally a chapter 7 debtor would lack standing to object to a trustee's administration of an estate.  *See In re 1333 Baecher Lane VA, LLC*, Case No. 24-71088-SCS, 2025 WL 3083057, at \*13, 2025 Bankr. LEXIS 2859, at \*39-40 (Bankr. E.D. Va. Nov. 4, 2025).  However, as Malloy appears to be a solvent debtor, he may have a residual stake in the outcome sufficient to grant him standing.  *See id.*, 2025 Bankr. LEXIS 2859, at \*40

se Debtor,[2] and the record in this bankruptcy case, the Court finds: (i) that the Trustee has satisfied

the factors set forth in *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995); (ii) that entry into

the Settlement Agreement is a valid exercise of the Trustee's business judgment; (iii) that the

Settlement Agreement falls well above the lowest range of reasonableness; and (iv) that approval

of the Settlement Agreement is in the best interest of the Estate.  For these reasons, the Court will

grant the Motion and approve the Settlement Agreement.

This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law

pursuant to Bankruptcy Rule 7052.[3]  The Court has subject matter jurisdiction over this contested

matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the general order of reference of the United

States District Court for the Eastern of Virginia dated August 15, 1984.[4]  This is a core proceeding

---

[2]    The Debtor is not a member of the Bar of this Court.  For a very brief period of time, the Debtor was represented by an attorney who is a member in good standing of the Bar of this Court, but the Debtor chose to terminate that engagement.  Hr'g Tr. 125:20-126:1, ECF No. 1120 at 112-13.  Although the Debtor now proceeds pro se in this bankruptcy case, the Debtor is a graduate of the University of Virginia school of law and is licensed to practice law in the State of New York, the State of Maryland, and the District of Columbia.  *Id.* 124:1-17, ECF No. 1120 at 111.  The Debtor also received his undergraduate degree from Harvard College, where he concentrated in economics.  *Id.* 123:15-25, ECF No. 1120 at 110.

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

[4]    Recently, the Debtor has moved the District Court to withdraw the reference for this Bankruptcy Case.  That decision is within the sole discretion of the District Court.  This Court retains jurisdiction while the motion to withdraw is pending.  *See* Fed. R. Bankr. P. 5011(c).

In this Court's experience, it would be highly unusual to withdraw the reference for an entire voluntary consumer bankruptcy case, particularly at this late stage of the case.  The statute provides for withdrawal upon "timely motion of any party."  28 U.S.C. § 157(d).  Although "timely" is not defined in the statute, case law defines it to mean "as soon as possible after the moving party is aware of grounds for withdrawal of reference or at the first reasonable opportunity after the moving party is aware of grounds for withdrawal of reference.  The timeliness requirement prevents parties from forum shopping, stalling, or otherwise engaging in obstructionist tactics."  *Off. Comm. of Unsecured Creditors v. Energy Coal Res., Inc.* (*In re Appalachian Fuels, LLC*), 472 B.R. 731, 736 (E.D. Ky. 2012) (internal quotations omitted).  At least one district court has noted:

> [T]he Appellant doesn't cite a single case—and we didn't find any—for the proposition that a party's broad dissatisfaction with her bankruptcy proceeding, or her belief that the bankruptcy court is being unfair to her, justified withdrawing the reference.  When a party loses before a lower court, it can appeal.  That's what the Appellant has done here—and that's all she's entitled to do.

under 28 U.S.C. § 157(b)(2)(A), (B), and (O) as this contested matter, i.e., the Settlement Motion, concerns the "administration of the estate," the "allowance or disallowance of claims against the estate," and "proceedings affecting the liquidation of the assets of the estate." Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

The Debtor, as seller, and the Creditors, as buyers, entered into a Central Virginia Multiple Listing Services Purchase Agreement dated February 25, 2022, and ratified February 26, 2022 (together with an integrated Bill of Sale, the "Contract"), pursuant to which the Debtor agreed to sell, and the Creditors agreed to purchase certain real property commonly known as 1600 Mill Quarter Rd., Powhatan, VA 23139 (the "Real Property").[5] Disputes between the Debtor and the Creditors arose following the execution of the Contract that resulted in the Creditors commencing litigation against the Debtor in the Powhatan County Circuit Court (the "State Court") for specific performance of the Contract, for damages, for declaratory relief, and for injunctive relief (the "State Court Litigation").

---

> In many consumer bankruptcies, including this one, at least one party (usually the debtor) will come away unhappy with the process. If that alone justified withdrawing the reference, then bankruptcy courts would never adjudicate any consumer cases—and district courts would be inundated with them. In the end, we'd deprive ourselves of "the benefit of the bankruptcy court's experience in both the law and [these kinds of] facts, . . . leading to an inefficient allocation of judicial resources." We have the discretion, in other words, not to shoot ourselves in the foot.

*Richert v. Calderin*, Case No. 24-CV-21901, 2025 WL 263454, at *3, 2025 U.S. Dist. LEXIS 10872, at *7-8 (S.D. Fla. Jan. 22, 2025) (quoting *Stettin v. Regent Cap. Partners, Ltd. Liab. Co.* (*In re Rothstein, Rosenfeldt, Adler, P.A.*), Case No. 11-62612, 2012 WL 882497, at *4, 2012 U.S. Dist. LEXIS 50910, at *13 (S.D. Fla. Mar. 14, 2012)).

[5]    On the Petition Date, the Real Property served as the Debtor's primary residence. However, the Debtor has since represented to the Court that he moved out of the Real Property on August 25, 2025. Dec. 18, 2025, Hr'g Tr. 85:8-13, ECF No. 969 at 85. To date, the Debtor has not filed a change of address with this Court. *See* Fed. R. Bankr. P. 4002(a)(5) (requiring a debtor to file a statement of any change in address). It is unclear to the Court whether the Real Property continues to serve as the Debtor's primary residence.

The State Court Litigation was scheduled for trial on October 6, 2023.  The day before trial in the State Court Litigation was set to begin, the Debtor filed, pro se, a voluntary petition under Chapter 13 of Title 11 of the United States Code (the "Bankruptcy Code") with this Court, thereby commencing the above-captioned bankruptcy case (the "Bankruptcy Case") on October 5, 2023 (the "Petition Date").  By operation of section 362 of the Bankruptcy Code, the State Court Litigation was stayed automatically.  *See* 11 U.S.C. § 362(a).  The Debtor subsequently filed a *Notice of Removal*, thereby removing the State Court Litigation to this Court and commencing Adversary Proceeding No. 23-03043-KRH (the "Adversary Proceeding").  *See* Fed. R. Bankr. P. 9027(a)(2).  The Creditors moved to remand the State Court Litigation back to the State Court.

Concluding that mandatory abstention required remand, *see* 28 U.S.C. § 1334(c)(2), this Court entered its *Order Granting Motion for Expedited Hearing and Motion to Remand* (the "Remand Order") on December 20, 2023, in the Adversary Proceeding, granting the Creditors' motion and remanding the State Court Litigation back to the State Court.  The remand was effective upon issuance of the Remand Order.  *Bryan v. BellSouth Commc'ns, Inc.*, 492 F.3d 231, 235 (4th Cir. 2007) ("A remand is effective. . . , if the remand is based on the lack of subject-matter jurisdiction . . . , when the remand order is entered."  (internal citation omitted)).  The Debtor unsuccessfully appealed the entry of the Remand Order.  Most recently, on June 22, 2026, the Supreme Court of the United States denied the Debtor's petition for a writ of certiorari concerning the validity of the Remand Order.  *See Malloy v. Schelin*, Case No. 25-1234 (June 22, 2026).

In addition to remanding the State Court Litigation, this Court also modified the automatic stay to permit the Creditors to continue the State Court Litigation to a final judgment.  The automatic stay remained in effect to preclude the enforcement of any judgment awarded by the

4

State Court without first seeking further relief from this Court in order to afford the Debtor an opportunity to satisfy any judgment entered by the State Court in the context of a Chapter 13 plan.

Following remand of the litigation, the State Court conducted a trial in May of 2024, on the merits in order to liquidate the Creditors' claim for the Debtor's breach of the Contract. On October 20, 2024, the State Court entered its final judgment for breach of the Contract in favor of the Creditors against the Debtor concerning the Real Property (the "Powhatan Order"). "The Rooker-Feldman doctrine prohibits lower federal courts from sitting in review of state court decisions." *In re Meredith*, 337 B.R. 574, 578 n.5 (Bankr. E.D. Va. 2005) (citations omitted); *see also In re Meridien Energy, LLC*, Case No. 23-31377-KLP, 2024 WL 2471792, at *3, 2024 Bankr. LEXIS 1205, at *8 (Bankr. E.D. Va. May 23, 2024) ("In essence, the doctrine generally precludes a federal court from interfering with ongoing state-court litigation."). The *Rooker-Feldman* doctrine applies to preclude federal court review of all state court orders – both final and interlocutory. *T. M. v. Univ. of Md. Med. Sys. Corp.*, Case No. 25-197, 608 U.S. __, 146 S. Ct. 1739, 1748-49 (2026). Accordingly, this Court adopted the findings of the State Court and the Powhatan Order.

By the Powhatan Order, the State Court entered judgment in favor of the Creditors for the remedy of specific performance:

> Judgment is granted to the Plaintiffs for the remedy of specific performance, ordering the Defendant to specifically perform and comply with all of his obligations pursuant to the terms of the Contract, except as specifically ordered herein, in connection with Settlement, and ordering the Defendant to promptly proceed to complete closing and Settlement of the Contract for the sale and purchase of the Property for a Sales Price of Nine Hundred and Thirty Thousand Dollars ($930,000.00), subject to the prorations, credits and adjustments at Settlement per the terms of the Contract and this Final Judgment, including without limitation the Defendant's conveyance of title to the Property to Plaintiffs in conformity with the requirements of the Contract by general

5

> warranty deed with English covenants of title in form and upon terms reasonably acceptable to the Plaintiffs and their legal counsel as required in Standard Provision B of the Contract. Defendant shall have no right to terminate the Contract, and shall specifically perform all obligations, conditions and requirements of the Seller to promptly transfer good, clear, marketable and insurable title to the Property to the Plaintiffs pursuant to the Contract.

Powhatan Order ¶ 6. Additionally, the State Court awarded the Creditors "their compensatory, resulting, and related damages for all amounts incurred or paid by Plaintiffs in connection with the enforcement of the Contract, as well as any damages sustained by Plaintiffs as a consequence of, or arising from or relating in any way to the Defendant's breach and default." *Id.* ¶ 8. The State Court determined that damages were no less than $395,177.46 plus 6% interest from May 21, 2024, until paid in full (the "Powhatan Order Damages"). *Id.* A portion of the Powhatan Order Damages ($35,438.27) constituted insurance proceeds received by the Debtor related to roof damage to the Property caused by a fallen tree. *Id.* ¶ 8(A). The State Court did not award certain other damages requested by the Creditors. *Id.* ¶ 9. Both the Debtor and the Creditors appealed the Powhatan Order, which appeals are pending before the Court of Appeals of Virginia (the "State Court Appeals").[6] By orders dated July 14, 2025, the Court of Appeals of Virginia stayed the State Court Appeals pending further order of this Court.

As part of the Powhatan Order, the State Court awarded the Creditors damages on account of their attorneys' fees through May 29, 2024. Pursuant to the terms of the Contract, the Creditors remain entitled to and the Estate remains liable for "any damages and all expenses incurred by" the Creditors, "including, without limitation, attorney's fees." Consistent therewith, the Court has

---

[6] These State Court Appeals are property of the Estate. *See* 11 U.S.C. §§ 348(f)(1), 541(a)(1); *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 342 (4th Cir. 2013) ("[N]on-bankruptcy causes of action that arose out of events occurring prior to the filing of the bankruptcy petition" are property of the estate.). Upon conversion, the Chapter 7 trustee, not the Debtor, was vested with standing to pursue – or dismiss – such appeals. *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.*, 187 F.3d 439, 441 (4th Cir. 1999) ("If a cause of action is part of the estate of the bankrupt then the trustee alone has standing to bring that claim.").

6

entered interim orders approving two applications for fees, and it has taken the third application for fees under advisement.  By the first interim order entered December 23, 2024 [ECF No. 616], this Court ordered "that the Creditors are entitled to reimbursement of attorneys' fees in the amount of $50,142.50 and costs in the amount of $883.42 for the time period of May 31, 2024, through October 27, 2024" (the "First Fee Order"), which represents a Court-ordered reduction in the amount of fees and costs requested ($85,748.00 and $982.77, respectively) by $35,704.85.  By the second interim order entered May 22, 2025 [ECF No. 770], the Bankruptcy Court awarded the Creditors "attorneys' fees in the amount of $36,234.00 and costs in the amount of $1,657.03 for the time period of October 28, 2024, through January 31, 2025" (the "Second Fee Order").  The Creditors also filed a third application [ECF No. 1046] (the "Third Fee Application") on March 10, 2026, seeking reimbursement of attorney's fees in the amount of $159,883.45 and costs in the amount of $4,048.91 for the period of February 1, 2025, through January 31, 2026.  The Court has taken the Third Fee Application under advisement and has not yet rendered its decision thereon.

In the one-year period between the Petition Date and the date of entry of the Powhatan Order, the Debtor had not filed a motion to reject the Contract under section 365 of the Bankruptcy Code.  Pursuant to this Court's November 4, 2024, Memorandum Opinion [ECF No. 481] (the "Memorandum Opinion," and together with the Powhatan Order, the "Judicial Orders"), this Court determined that the Contract had merged into the Powhatan Order and was no longer an executory contract capable of rejection under section 1322(b)(7) of the Bankruptcy Code.[7]  By operation of

---

[7]  The Court held in its Memorandum Opinion that a contract can be rejected under section 1322(b)(7) of the Bankruptcy Code only if the contract was executory.  Mem. Op. 7, ECF No. 481 at 7 (citing *Gloria Mfg. Corp. v. Int'l Ladies' Garment Workers' Union,* 734 F.2d 1020, 1022 (4th Cir. 1984)).  Whether the contract was executory had to be determined as of the time of the confirmation hearing, not as of the Petition Date.  *Id.* (quoting *Kaye v. A.R.E. Distrib. & Alpine Records, LLC (In re Value Music Concepts, Inc.)*, 329 B.R. 111, 123 (Bankr. N.D. Ga. 2005)).  Once the State Court had decreed specific performance, the Contract for the sale of real estate was no longer executory.  *Id.* at 8 (first citing *In re Giordano*, 446 B.R. 744, 749 (Bankr. E.D. Va. 2010); then citing *In re Bennett Enters.*, 628 B.R. 481, 488 (Bankr. D.N.J. 2021); and then quoting *Watson v. Confer (In re*

the Judicial Orders, the Debtor was required to (1) specifically perform the Contract and sell the Real Property to the Creditors with good, clear, marketable, and insurable title; (2) pay liquidated damages in the amount not less than $395,177.46 plus interest; and (3) pay any futures fees and costs incurred by the Creditors as approved by this Court in connection with the Debtor's breach of the Contract.

As part of his Chapter 13 bankruptcy, the Debtor was given an opportunity to propose a Chapter 13 plan that, among other things, complied with the terms of the Judicial Orders.[8] Each of the Chapter 13 plans proposed by the Debtor failed to comply with the foregoing ordered relief. Indeed, the Debtor consistently took affirmative actions that contradicted the terms of the Judicial Orders, including attempted rejection of the Contract after merger, *see* ECF No. 20, 481, retention of the Real Property despite the award of specific performance, *see* ECF No. 632, and conditioning specific performance on terms not contemplated by the Powhatan Order, *see* ECF No. 736.

In part due to the Debtor's unwillingness to propose a Chapter 13 plan that complied with the Judicial Orders, on April 1, 2025, this Court further modified the automatic stay to permit the Creditors to enforce paragraphs 6 and 7 of the Powhatan Order with respect to the specific

---

*Confer*), Case No. EC-21-1140-TBG, 2022 WL 737589, at *5, 2022 Bankr. LEXIS 631, at *13-14 (B.A.P. 9th Cir. Mar. 10, 2022)).

Assuming arguendo that the Debtor had been permitted to reject the Contract, rejection would have operated as the Debtor's breach of the Contract immediately prior to the Petition Date. 11 U.S.C. § 502(g)(1). In other words, the Debtor still would be liable for damages based on his breach of the Contract (which would need to be paid in full with interest from his solvent bankruptcy estate). However, inability to reject the Contract inured to the Debtor's benefit as the Debtor retained possession of the Real Property for an additional year from entry of the Memorandum Opinion through the date the Creditors declined to close, which decision was based in large part upon the significant deterioration caused by the Debtor's failure to maintain the Real Property. Had the Debtor specifically performed the Contract timely after entry of the Memorandum Opinion or had the Debtor properly maintained the Real Property as required by section 24(D) and (E) of the Contract and paragraph 10 of the Powhatan Order, the Debtor would not have enjoyed the benefit of residing in the Real Property for at least an additional nine months. *See supra* note 5.

[8]   The *Order Denying Confirmation of Proposed Chapter Plan* [ECF No. 482] was entered "without prejudice to the Debtor to file an amended plan"

8

performance relief granted therein. *Order Granting Relief from Stay*, ECF No. 733 at 2. The order also required the Debtor "to cooperate in all respects with [the Creditors] in connection with their enforcement of the Final Judgment and his obligations pursuant to the Final Judgment." *Id.* Despite this Court's clear instructions in its April 1, 2025, *Order Granting and/or Modifying Relief from Stay* [ECF No. 733], the Debtor failed to cooperate with the Creditors and specifically perform the Contract.

In light of the Debtor's repeated and willful failure to comply with orders from this Court and the State Court, the Court converted the Debtor's case from Chapter 13 to one under Chapter 7 of the Bankruptcy Code pursuant to the *Order Denying Confirmation of Plan and Converting Case* entered by the Court on May 20, 2025 (ECF No. 762) (the "Conversion Order"). The Court determined that conversion was appropriate because the Debtor was not willing to propose a confirmable plan that comported with the Judicial Orders. The Court found that the Debtor proposed the last plan in bad faith, as evidenced by his willful refusal to abide by orders of this Court. The Court further found that the Debtor filed this Bankruptcy Case in bad faith and that the Debtor had proceeded in bad faith in this Bankruptcy Case, in an attempt to improperly evade his obligations under the Contract rather than as a means of structuring a plan for performing them.

The Court found cause existed under section 1307(c) of the Bankruptcy Code and that conversion would be in the best interest of the Debtor's creditors and Estate.[9] Specifically, the

---

[9] Pursuant to section 1307(c) of the Bankruptcy Code, the Court could either have converted or dismissed the Chapter 13 case, whichever it found to be "in the best interests of creditors and the estate." 11 U.S.C. § 1307(c). The United States Bankruptcy Court for the District of Maryland recently had the opportunity to explore whether conversion or dismissal was appropriate for Chapter 13 debtors who were found to be proceeding in bad faith:

> Conversion of this case and appointment of a chapter 7 trustee as a fiduciary will limit, if not eliminate, the Debtors' ability to continue to drag out the bankruptcy process to the detriment of their creditors. Assets of the estate would be marshaled and, where appropriate, liquidated. Creditors would be repaid, in whole or in part, more quickly than they would in a (hypothetically feasible) chapter 13 plan.

9

Court determined that conversion would limit the Debtor's endless frivolous litigation and allow for the enforcement and execution of the Judicial Orders. The Court found that a trustee appointed under Chapter 7 of the Bankruptcy Code would be able to effectively administer the Estate. Pursuant to the Conversion Order, the Trustee was appointed on or about May 22, 2025, and he continues to serve in that capacity as he administers the assets of the Estate, including the Real Property.

After his appointment, the Trustee was able to make significant progress in effectuating the terms of the Powhatan Order. Pursuant to this Court's *Order Granting Chapter 7 Trustee's Motion to Approve Sale of Real Property Free and Clear of Liens, Claims, Interests, and Conditional Application to Employ Realtor* [ECF No. 876], the Trustee was expressly permitted to sell the Real Property. The Creditors were given until October 30, 2025, to close on the purchase of the Real Property for $930,000, in accordance with the Powhatan Order. The Order further provided that if the Creditors failed to timely close, the Estate would no longer be obligated to specifically perform the Contract, but that the Estate would remain liable for the amounts awarded by the Judicial Orders.

After extensive inspections of the Real Property revealed significant deterioration during the three and a half years of litigation, the Creditors declined to close on their purchase of the Real

---

> Although [the party seeking conversion] has not argued for dismissal here, the Court must nevertheless consider whether dismissal would be in the best interests of creditors and the estate. If the Court were to dismiss this case, a race to the (state) courthouse would likely follow. . . . It is not inconceivable that at some point during this race, the Debtors would file another bankruptcy petition to stymie their creditors' efforts in state court, bringing all parties before the Court again. The Debtors' conduct in this case, both in terms of its scope and its repetition, gives the Court little hope that the Debtors would behave any differently in another bankruptcy case.

*In re Brown*, 671 B.R. 461, 474 (Bankr. D. Md. 2025). For similar reasons, this Court determined that conversion, rather than dismissal, was appropriate in this Bankruptcy Case.

10

Property.  After it became apparent that the sale would not close, the Trustee's focus shifted from selling the Real Property to otherwise resolving the Creditors' claims against the Estate.  *See* Dec. 1, 2025, Hr'g Tr. 79:11-80:17, ECF No. 969 at 79-80.

On April 1, 2026, the Creditors filed an amended proof of claim [Claim No. 2-3] (the "Proof of Claim") in the Bankruptcy Case.[10]  The Proof of Claim asserts a secured claim against the Estate in the amount of $702,163.00, which amount includes:

| | | |
|---|---|---:|
| **State Court Judgment** | | |
| Original Principal Amount | $ | 395,177.46 |
| Credit for Roof Repairs | $ | (35,438.27) |
| Accrued Interest at 6% | $ | 40,215.20 |
| **Subtotal for State Court Judgment** | **$** | **399,954.39** |
| **Fee Applications** | | |
| First Fee Order | | |
| Principal Award | $ | 51,025.92 |
| Accrued Interest at Federal Rate | $ | 2,675.69 |
| Subtotal for First Fee Order | $ | 53,700.69[11] |
| Second Fee Order | | |
| Principal Award | $ | 37,891.03 |
| Accrued Interest at Federal Rate | $ | 1,274.84 |
| Subtotal for Second Fee Order | $ | 39,165.87 |
| Third Fee Application | $ | 163,932.36 |
| **Subtotal for Fee Applications** | **$** | **256,798.92** |
| **2025 Inspection Costs** | | |
| 2025 Termite Inspection | $ | 500.00 |
| 2025 Dylan Morgan Home Inspection | $ | 2,305.00 |
| 2025 Hammersmith Inspection | $ | 1,500.00 |
| 2025 Pool Inspection | $ | - |
| 2025 Chimney Inspection | $ | 1,050.00 |
| 2025 Well Inspection | $ | 757.05 |
| 2025 Septic Inspection | $ | 3,296.00 |
| **Subtotal for 2025 Inspection Costs** | **$** | **9,408.05** |
| **Return of Deposit** | **$** | **9,300.00** |
| **Expenses Not Allowed by Powhatan Order but Challenged in State Court Appeal** | | |
| Expert Fees and Costs (Exclusive of Mark C. Shuford, Esq.) | | |
| Loan fees and financing costs related to the State Court litigation | $ | 16,198.00 |
| Inspection fees and costs prior to State Court trial | $ | 2,003.67 |
| **Subtotal for Expenses Related to State Court Appeal** | **$** | **26,701.67** |
| **Total** | **$** | **702,163.03** |

---

10   The Trustee had filed an objection [ECF No. 942] to the Creditor's prior proof of claim [Claim No. 2-2].

11   There appears to be a discrepancy in the calculation of this amount as the stated principal and interest for the First Fee Order should total $53,701.61, 92 cents more than the claimed amount.  Given that the Settlement Motion will compromise the Proof of Claim and given that the amount sought by the Proof of Claim is less, the Court finds that the discrepancy is immaterial.

During hearings conducted by the Court on April 16, 2026, counsel for the Creditors and counsel for the Trustee announced on the record in open court that they had reached a settlement fully resolving the Proof of Claim and that they would be filing a motion to approve compromise as required by Bankruptcy Rule 9019.  *See* April 16 Hr'g Tr. 3:22-4:7; 4:12-16, ECF No. 1062 at 3-4.  Counsel for the Trustee announced in open court the broad terms of the settlement:

> [T]he trustee would seek Court approval to pay . . . the state court judgment . . . minus the roof repair amount, plus all orders . . . already . . . entered by the Court within 30 days. . . . [T]he trustee reserve[d] rights, with respect to [the third] fee application . . . and . . . to any future fee applications.  So the settlement would resolve anything that was already in an order in place . . . with understanding that the creditors are likely to file another fee application in the future, that the trustee reserves the right to object to.

*Id.* 10:18-11:8, ECF No. 1062 at 10-11.  Acknowledging that he had heard the announcement of the proposed settlement, the Debtor complained about the terms and nature.  *Id.* 12:7-8, ECF No. 1062 at 12.  After the conclusion of the April 16 hearing, the Debtor ordered a copy of the transcript of the April 16 hearing containing this colloquy, which transcript was docketed the following day.

After learning about the overarching terms of the settlement on April 16, 2026, the Debtor received a draft of the settlement agreement on May 12, 2016, as well as copies of all the invoices for the attorney's fees incurred by the Creditors.  Hr'g Tr. 27:15-16, 30:14-21, 32:17-20, ECF No. 1120 at 27, 30, 32.  Upon receipt of the draft settlement agreement, the Debtor immediately sent counsel for the Trustee his comments and objections to the draft settlement agreement that same evening.  *Id.* 31:3-6, ECF No. 1120 at 31.  Six days later, on May 18, counsel for the Trustee notified the Debtor via email that the Trustee had reached a final agreement with the Creditors and would be filing a motion to approve compromise shortly.[12]  *Id.* 31:7-12, ECF No. 1120 at 31.  That

---

[12]   The only difference between the draft version of the Settlement Agreement that the Debtor received on May 12 and the final version received on May 18 was the inclusion in the final version providing that the Creditors would

12

afternoon, counsel for the Trustee filed the Settlement Motion, with a copy of the Settlement Agreement attached. The Debtor does not contest that he received the Settlement Motion on May 18 when it was publicly filed with the Court.

In accordance with this Court's Local Bankruptcy Rules and together with the Settlement Motion, counsel for the Trustee filed a *Notice of Motion and Hearing* [ECF No. 1071] (the "Hearing Notice"), which provided a 21-day response period for the Settlement Motion and set a hearing date a month later, on June 18. On the very last day of the response period established by the Hearing Notice, the Debtor filed a 64-page Objection to the Settlement Motion. Contemporaneously with his Objection, the Debtor filed the *Debtor's Motion for Continuance of Hearing on Trustee's Motion for Order Approving Proposed Settlement* [ECF No. 1088] and the *Debtor's Motion to Hold Trustee's Motion for Order Approving Proposed Settlement in Abeyance* [ECF No. 1089]. Two days later, on June 10, the Debtor filed the *Debtor's Emergency Motion for Stay Pending Appeal of Conversion Order Pursuant to Federal Rule of Bankruptcy Procedure 8007 and Request for Expedited Hearing Pursuant to LBR 9013-1(N)* [ECF No. 1093]. By separate Order, the Court denied all three of the foregoing motions.

## TERMS OF THE SETTLEMENT AGREEMENT

The terms of the proposed Settlement Agreement are, in pertinent part, as follows:

1.      The Claimants will be entitled to an allowed claim against the Estate under § 502 of the Bankruptcy Code in the amount of $518,565.31 (the "Allowed Claim") with interest at the federal judgment rate of interest from April 1, 2026, until paid in full. Unless the Creditors

---

not object to the Debtor's discharge. As will be more fully discussed herein, the inclusion of this language almost exclusively benefits the Debtor personally, although it will also hopefully benefit the Estate by reducing the amount of litigation and corresponding fees for which the Estate would otherwise be liable.

materially breach the Settlement Agreement, the Allowed Claim will not be subject to objection or setoff by the Estate or Trustee.  Settlement Agreement ¶ 2, ECF No. 1070 at 13.

2.      The Allowed Claim does not include the Third Fee Application or any subsequent fee application the Creditors may file.  *Id.* ¶¶ 3, 4, ECF No. 1070 at 13.

a.      The Trustee will endorse a proposed order approving the Third Fee Application in the amount of $150,726.45 in fees and $4,048.91 in expenses.[13]  *Id.* ¶ 3, ECF No. 1070 at 13.  The Trustee's endorsement does not preclude or subsume the Court's independent obligation to review and approve all professional fees.[14]  The amount of fees awarded in connection with the Third Fee Application may be less than the amount provided in the Settlement Agreement.

b.      The Creditors must file interim fee applications for any fees incurred after the time period covered by the Third Fee Application as well as a final fee application seeking final approval of all fees and expenses awarded on an interim basis.  The Trustee retains all rights in connection with those future interim and final fee applications.  *Id.* ¶ 11, ECF No. 1070 at 15.

3.      The Trustee will pay the Allowed Claim and any other amounts approved by the Court related to the Third Fee Application or subsequent fee applications from the assets of the Estate.  *Id.* ¶ 4, ECF No. 1070 at 13.

---

[13]   This amount reflects an agreed-upon reduction of approximately $9,000 negotiated by the Trustee.  Hr'g Tr. 60:21-61:10, ECF No. 1120 at 60-61.

[14]   With respect to the fee components of the Settlement Agreement, the Trustee explained that he is not presuming to determine the amount of fees to be awarded to the Creditors on an interim and final basis.  Such determinations remain within the province of this Court.  *Id.* 43:6-14, ECF No. 1120 at 43 ("We don't in any way, shape, or form, Judge, presume that we would be awarding the fees.  That's clearly in your province. . . . We're just not going to object on that adjusted number.").

14

4.      Any deposit paid by the Creditors under the Contract will be returned to the Creditors.  *Id.* ¶ 5, ECF No. 1070 at 13.

5.      The Trustee and the Creditors will dismiss the State Court Appeals.  *Id.* ¶ 9, ECF No. 1070 at 15.

6.      The Trustee and the Estate, on one hand, and the Creditors, on the other hand, will mutually release each other from all claims related to the Contract, the Powhatan Order, and the State Court Appeals.  *Id.* ¶ 8, ECF No. 1070 at 13-15.

7.      The Creditors will waive the right to object to the Debtor's discharge.  *Id.* ¶ 10, ECF No. 1070 at 15.

Although the Debtor is not a signatory to the Settlement Agreement and is not a party to the releases contained in the Settlement Agreement, paragraph 10 of the Settlement Agreement inures to the direct benefit of the Debtor.  The Creditors had requested and received multiple extensions of the time to file an objection to the Debtor's discharge, most recently through August 14, 2026.  *See* Third Order Extending Time to File a Compl. to Object to the Discharge, ECF No. 1066.  An objection by the Creditors to the Debtor's discharge would commence a separate adversary proceeding to determine whether the Debtor had engaged in some conduct identified in section 727(a) of the Bankruptcy Code that would disqualify the Debtor from receiving a discharge.  Inclusion of this provision in the final version of the Settlement Agreement would serve to avoid at least one avenue of further litigation between the Creditors and the Debtor, resolve three interlocutory appeals taken by the Debtor to the District Court, and allow the Debtor to receive his discharge in the ordinary course.

The Trustee testified that the Settlement Agreement will liquidate the Creditors' claims against the Estate to a sum certain, which sum can be paid through the Trustee's administration of

the Estate.  The Estate will release all claims against the Creditors, resulting in the termination of the various state court proceedings.  The Debtor will be eligible to receive his Chapter 7 discharge, which would extinguish the Debtor's liability for any pre-petition claims held by the Creditors, other creditors, and the Estate.

The Trustee testified that, holistically, the Settlement Agreement provides a means for the longstanding dispute among the Creditors and the Estate to be fully and finally resolved, creates a path by which the Trustee can efficiently complete his administration of the Estate, and provides an opportunity to bring this Bankruptcy Case to conclusion.  For these reasons the Trustee believes that the Settlement Agreement is in the best interests of the Estate.

## CONCLUSIONS OF LAW

Compromises and settlements are a normal and typical part of bankruptcy.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424 (1968); *see also MarkWest Liberty Midstream & Res., LLC v. Meridien Energy, LLC*, Case No. 3:23-cv-593 (DJN), 2024 WL 3345342, at *15, 2024 U.S. Dist. LEXIS 120599, at *46 (E.D. Va. July 9, 2024) ("[B]ankruptcy law generally favors settlements").  "In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts."  *TMT Trailer Ferry*, 390 U.S. at 424. Accordingly, the Bankruptcy Rules permit a trustee to settle matters, subject to approval by the bankruptcy court.  Fed. R. Bankr. P. 9019(a).  "The decision whether to approve a compromise under Bankruptcy Rule 9019 is committed to the sound discretion of the Court."  *Arrowsmith v. Mallory* (*In re Health Diagnostic Lab'y, Inc.*), 588 B.R. 154, 162 (Bankr. E.D. Va. 2018) (citing *Shaia v. Three Rivers Wood, Inc.* (*In re Three Rivers Woods, Inc.*), Adv. Pro. No. 99-03020-DOT, 2001 WL 720620, at *5, 2001 Bankr. LEXIS 737, at *13 (Bankr. E.D. Va. Mar. 20, 2001).

16

"In order to approve a compromise, this court must look at various factors and determine whether the compromise is in the best interest of the estate and whether it is fair and equitable." *In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997). Those four factors include: "(i) the probability of success in litigation; (ii) the potential difficulties in any collection; (iii) the complexity of the litigation and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors." *In re Health Diagnostic Lab'y, Inc.*, 588 B.R. at 162 (quoting *In re Alpha Nat. Res. Inc.*, 544 B.R. 848, 857 (Bankr. E.D. Va. 2016)); *see In re Austin*, 186 B.R. at 400; *see also MarkWest*, 2024 WL 3345342, at *14, 2024 U.S. Dist. LEXIS 120599, at *42 (citations omitted); *Fetner v. Hotel St. Cap., L.L.C.*, Case No. 1:20-cv-828 (AJT/MSN), 2021 WL 1022585, at *3, 2021 U.S. Dist. LEXIS 52980, at *6 (E.D. Va. Feb. 5, 2021), *aff'd*, Case No. 21-1285, 2021 WL 4922324, 2021 U.S. App. LEXIS 31755 (4th Cir. Oct. 21, 2021) (per curiam); *In re Three Rivers Woods, Inc.*, 2001 WL 720620, at *6, 2001 Bankr. LEXIS 737, at *16-17 (calling the *Austin* factors "the basic criteria for consideration of a motion to approve a compromise and settlement" within the Eastern District of Virginia). The trustee bears the burden of persuasion that the settlement is fair and equitable and should be approved by the bankruptcy court. *In re Frye*, 216 B.R. at 174 (citing *Martin v. Kane* (*In re A & C Props.*), 784 F.2d 1377, 1381 (9th Cir. 1986)).

The Court reviews the trustee's decision to settle "utilizing a business judgment standard." *SunTrust Bank v. Matson* (*In re CHN Constr., LLC*), 531 B.R. 126, 133 (Bankr. E.D. Va. 2015). In determining whether the trustee has properly exercised his business judgment, the bankruptcy court need not "'conduct a full evidentiary hearing or mini trial' before approving a settlement." *In re Alpha Nat. Res. Inc.*, 544 B.R. at 857 (quoting *In re Three Rivers Woods, Inc.*, 2001 WL 720620, at *6, 2001 Bankr. LEXIS 737, at *18)). "[T]he test is not whether the trustee would have

17

prevailed at trial." *In re Three Rivers Woods, Inc.*, 2001 WL 720620, at *6, 2001 Bankr. LEXIS 737, at *18. "Instead, the Court must decide whether the settlement falls below the lowest point in the range of reasonableness." *In re LeClairRyan PLLC*, Case No. 19-34574-KRH, 2022 WL 2346849, at *9, 2022 Bankr. LEXIS 1817, at *24 (Bankr. E.D. Va. June 28, 2022) (citations omitted). If a settlement meets this standard, the Court may approve it, even over objections, *MarkWest*, 2024 WL 3345342, at *15, 2024 U.S. Dist. LEXIS 120599, at *46 (citations omitted), including objections by a debtor, *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1010 (4th Cir. 1985) (alteration in original) ("Objection by the debtor is not fatal to such a settlement if '[it] is found to be in the best interests of the estate as a whole.'" (quoting *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1138 (8th Cir. 1984))). Applying the foregoing legal standard and in light of the overwhelming evidence presented at the Hearing, the Court finds that the Trustee has met his burden of persuasion as the proponent of the Settlement Motion as well as his underlying burden of proof.

The Court finds that the compromise is fair and equitable, is a reasonable exercise of the Trustee's business judgment,[15] and falls well above the lowest point of reasonableness. The evidence presented at the Hearing, including the testimony of the Trustee, reflects that the Settlement Agreement was the result of extensive, arms-length negotiation conducted in good faith by and among the Trustee and the Creditors.[16] *See* Hr'g Tr. 40:15-19, ECF No. 1120 at 40.

---

[15]    The Trustee has a wealth of experience to inform his business judgment. The Trustee was admitted to the Virginia state bar in 1987. *Id.* 116:11-13, ECF No. 1120 at 103. He was appointed to this Court's panel of standing Chapter 7 trustees in the fall of 2019. *Id.* 116:14-17, ECF No. 1120 at 103. In his experience as a trustee, a bankruptcy practitioner, and a lawyer generally, he has settled many claims with different creditors. *Id.* 116:18-24, ECF No. 1120 at 103. The Proof of Claim in this Bankruptcy Case is "[n]ot even close" to the largest allowed claims he has administered as a Chapter 7 trustee. *Id.* 234:25-235-12, ECF No. 1120 at 221-22.

[16]    The Court further finds that the Settlement Agreement is not illegal, nor is it a product of collusion or against the public interest. The Debtor continues to make specious, unsupported claims insinuating some type of collusion,

18

The Debtor was invited to participate in the negotiation process but declined to do so in any meaningful way.[17] *See id.* 119:24-121:5, ECF No. 1120 at 106-108 ("I made the determination that [Malloy's] involvement in . . . the settlement negotiations was nonproductive, and frankly, resulted in continuing harm to himself in terms of the diminution of the surplus estate that I wish to return to him."). In addition to the evidence presented at the Hearing, the Debtor's refusal to be engage in meaningful settlement discussions was evidenced by the *Joint Motion for Order (A) Appointing Judicial Mediator and (B) Granting Leave for the Virginia Court of Appeals to Proceed with Pending Appeals* [ECF No. 1041] (the "Judicial Mediation Motion"). By the Judicial Mediation Motion, the Trustee and the Creditors sought to *compel* the Debtor to participate in judicial mediation so as to reach a global settlement:

> The negotiations between the Trustee and the Creditors have been conducted in good faith and – almost – resulted in a global settlement agreement concerning the Creditors' claims that would be submitted to this Court in the form of a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. The hindrance – as it has been all along – is the Debtor with whom the Trustee has communicated concerning the settlement discussions generally and, more recently, the specific terms of a settlement agreement resolving the Creditors' claims (and addressing how the parties would resolve those claims not yet asserted by the Creditors in the case).

> Simply put, the Debtor does not believe the estate should pay anything to the Creditors on account of their claims (including the claims approved by this Court in orders currently subject to the Debtor's appeals). So it appears that a global settlement agreement is not in prospect . . . .

---

which the Court has already rejected in connection with various other contested matters. As the Debtor again produced no evidence to support his baseless conspiracy theories, the Court will not address them further.

[17]  The Debtor contests this characterization, instead claiming that he was never invited to discuss the Settlement Agreement. *Id.* 127:11-128:22, ECF No. 1120 at 114-15. The Court does not find this assertion credible.

Jud. Mediation Mot. 2-3, ECF No. 1041 at 2-3.  The Court denied the Trustee's request, finding that it would be an unreasonable burden on the Court's colleagues to conduct a mediation with an unwilling participant given the current posture of the case.  Local Bankruptcy Rule 9019-1(D)(2) ("The decision regarding appointment of a judicial mediator resides exclusively with the presiding judge.").  Indeed, it appears that the Debtor agreed with the futility of any such mediation as this Court's *Order Denying Joint Motion For Order (A) Appointing Judicial Mediator and (B) Granting Leave for the Virginia Court of Appeals to Proceed with Pending Appeals* [ECF No. 1043] is one of the few orders entered in this Bankruptcy Case which the Debtor has not appealed.

The record at the Hearing evidences that the Trustee comprehensively assessed the likely merits of litigation.  Upon his appointment, the Trustee commenced an investigation into the claims asserted by the Creditors and any potential defenses available to the Estate with respect to such claims.  Hr'g Tr. 39:2-7, ECF No. 1120 at 39.  That investigation included, but was not limited to, a review and analysis of the proofs of claim and fee applications filed by the Creditors in this Bankruptcy Case.  *Id.* 39:10-15, ECF No. 1120 at 39.  As part of his investigation into the Creditors' claims and his administration of the bankruptcy case at large, the Trustee also reviewed and became familiar with the various pleadings in this bankruptcy case, certain of the Debtor's many appeals, the State Court Litigation, the Powhatan Order, and the State Court Appeals.  *Id.* 37:22-39:1, ECF No. 1120 at 37-39.

The Proof of Claim filed by the Creditors asserted a claim in the amount of $702,163.03.  In his assessment, the Trustee concluded that much of the Creditors' claim had already been adjudicated by the Powhatan Order and – in the absence some alteration by the State Court Appeals – was fixed.  *Id.* 41:4-13, ECF No. 1120 at 41.  In determining how to value the Proof of Claim,

20

the Trustee also analyzed the value and risk associated with the State Court Appeals.[18] The Trustee determined that there was a very slim chance that the Estate or the Debtor would prevail in the State Court Appeals, but that there was some risk present to the Estate that the damages awarded to the Creditors in connection with the State Court Litigation may increase considerably, *id.* 42:21-43:7, ECF No. 1120 at 42-43, or that the State Court Appeals could result in a remand, causing further delays and expense to the Estate and the Creditors, *id.* 46:8-17, ECF No. 1120 at 46.

At the time settlement negotiations began, the Creditors were advocating for an increase in the amount of their claim to nearly a million dollars. *Id.* 45:8-17, ECF No. 1120 at 45. The million-dollar figure included a tax liability claim and damages that were subject to the State Court Appeals, *id.* 45:18-25, ECF No. 1120 at 45, in the approximate amount of $320,000, *id.* 101:7-12, ECF No. 1120 at 88. In the exercise of his business judgment, the Trustee determined that a allowing a reduced figure of $25,000 appropriately addressed the risk faced by the Estate that the Court of Appeals could award increased damages in favor of the Creditors. It also recognized the savings that would result from a corresponding reduction in further litigation. *Id.* 98:10-14, ECF No. 1120 at 85. Indeed, the Trustee noted that the reduction of liability from $320,000 to $25,000 is "an extraordinarily good settlement," which "eliminates a very big risk" and helps to slow "this ongoing attorney fee cycle" caused by the Debtor. *Id.* 101:22-102:2, ECF No. 1120 at 88-89. The Court agrees that this represents a remarkable achievement for the benefit of the Estate.

The Allowed Claim also includes $4,704.03 attributable to various inspection costs incurred by the Creditors in 2025 as a part of the ultimately unsuccessful sale of the Real Property. Although this amount was described as one-half of the total inspection costs incurred by the

---

[18] The Trustee's evaluation of the merits of the State Court Appeals also informed his decision to include in the Settlement Agreement a provision concerning the dismissal of the appeals by both parties.

21

Creditors (which is a correct calculation based on the Proof of Claim), at the Hearing, the Trustee acknowledged that there was a discrepancy of $250 between the amount claimed for inspection costs in the Proof of Claim and the total amount of the actual invoices attached to the Proof of Claim.[19] *Id.* 42:9-20, ECF No. 1120 at 42 (explaining that there was a missing invoice). However, the Trustee, in the exercise of his business judgment, determined that it was not worth attempting to renegotiate the Settlement Agreement to account for what would, at best, be a $125 reduction in the Allowed Claim. *Id.* 90:5-91:5, 115:14-20, ECF No. 1120 at 77-78, 102.

The remainder of the Allowed Claim reflects the amount of damages and fees already ordered by this Court and the State Court to be paid by the Estate to the Creditors.[20] Notwithstanding the fact that the Trustee would be obligated to pay these amounts from the Estate pursuant to the various court orders, the Trustee was still able to negotiate a discount. Under the Settlement Agreement, the amount of the Allowed Claim attributable to the Powhatan Order is reduced from $399,954.39 to $395,993.80, representing a reduction in the interest rate applicable from October 15, 2025, from the higher Virginia judgment rate (6%) to the lower federal judgment rate (3.61%).[21]

---

[19]  The Debtor asserts that the discrepancy is $368.05, not $250. Based on the Trustee's investigation, the Debtor's figure is based on the face amounts provided on the invoice and does not include a 3% processing fee charged by certain of the vendors. *See id.* 114:4-18, ECF No. 1120 at 101. The actual discrepancy is $250.

[20]  The Court is cognizant that there may be other types of damage claims that the Creditors have left unasserted such as those resulting from the Debtor's failure to maintain the Property as required by the Powhatan Order, which failure ultimately prevented the Creditors from closing on the sale of the Property.

[21]  Section 726 of the Bankruptcy Code provides for the order in which property of the estate is distributed to creditors. Because the Estate is solvent, all creditors are entitled to be paid interest at the legal rate from the Petition Date. 11 U.S.C. § 726(a)(5). Only then will any surplus be returned to the Debtor. *See id.* § 726(a)(6).

The term "legal rate" is not defined by the Bankruptcy Code. The is no consensus among the courts as to whether the legal rate refers to the federal judgment rate, *see e.g.*, *Onink v. Cardelucci* (*In re Cardelucci*), 285 F.3d 1231, 1234 (9th Cir. 2002), the state judgment rate, *see, e.g., In re Hicks*, 653 B.R. 562, 572 (Bankr. N.D. Ill. 2023), or the contractual rate, *see, e.g.*, *Ultra Petroleum Corp. v. Ad Hoc Comm. of OpCo Unsecured Creditors* (*In re Ultra Petroleum Corp.*), 51 F.4th 138, 159 (5th Cir. 2022). Given that the Settlement Agreement uses the lowest interest

22

The Allowed Claim includes $51,025.92, plus interest, on account of the First Fee Order and $37,891.03, plus interest on account of the Second Fee Order. Those are the amounts already approved by the Court on an interim basis. The Trustee has also negotiated a reduction in the amount of fees and expenses sought by the Creditors in connection with the pending Third Fee Application., reducing the amount sought for attorneys' fees from $159,883.45 to $150,726.45.[22] As the Debtor has done with all fees incurred in this bankruptcy case, whether associated with the Creditors, the Trustee's professionals, and even his own counsel for the brief period of time in which he was represented, the Debtor objects to the allowance of these fees.

But objection to the allowance of these fees as part of the Settlement Agreement is of no real moment. The fees previously awarded in the First Fee Order and the Second Fee Order were approved on an interim basis and must be finally approved in connection with a future to-be-filed final fee application. The Third Fee Application and any other fee application to be filed in connection with this case is subject to this Court's independent review. Regardless of the agreement negotiated by and between the Trustee and the Creditors, this Court is still obligated to review all fees awarded and to be awarded on a final basis for their reasonableness. The Settlement Agreement serves to set the floor for the interim fees already awarded and the fees requested in the Third Fee Application as endorsed by the Trustee. As it is anticipated that the Debtor may likely appeal any decision by this Court, the District Court will then have an opportunity to review this Court's award of fees on a final basis for an abuse of discretion. For all of these reasons, the

---

rate – the federal judgment rate – the Court finds that to be further indicia that the settlement falls well above the lowest range of reasonableness.

[22]   The Trustee does not object to the reimbursement of expenses in the original amount of $4,048.91.

Court finds that the amount of the Allowed Claim established by the Settlement Agreement falls well above the lowest range of reasonableness.

Consummation of the Settlement Agreement will provide a path to completion of the administration of the Debtor's bankruptcy estate. *Id.* 121:7-13, ECF No. 1120 at 108.  If the Estate is allowed to proceed with the Settlement Agreement, only the pendency of the Debtor's numerous appeals related to this Bankruptcy Case and the final fee applications would remain to be resolved. As the Trustee testified:

> [B]ut for the appeals, what would follow the closing of the settlement agreement would be fairly quickly the submission on my part of a trustee final report, which is something that's been reviewed by the Office of the U.S. Trustee, and they typically can take no longer than sixty days for review.
>
> It would then be submitted to the Court, and a notice would be given to all creditors and parties of interest with respect to the proposed distribution. And then, if there were no objections within that twenty-one day period after the notice, we would await a court order approving it, and then I would make the distributions.
>
> The hang up, of course, will be that the trustee's final report will be contested. There'll be an objection to that, I'm quite certain, and then appeals to what I believe would be an order approving this proposed distribution.
> "

*Id.* 47:4-19, ECF No. 1120 at 47.  However, approval of this Settlement Agreement will at least provide a path towards the successful conclusion of this Bankruptcy Case.

Despite the great result achieved for the Estate, the Debtor complains that the Settlement Agreement is not fair and equitable and should not be approved because he does not receive a release under the Settlement Agreement.  *Id.* 126:11-15, ECF No. 1120 at 113.  However, the Debtor readily acknowledges that he is unwilling to give a corresponding release to the Creditors and the Estate on the terms set forth in the Settlement Agreement.  *Id.* 127:3-8, ECF No. 1120 at 114.  The Debtor fails to acknowledge that he benefits under the terms of the Settlement Agreement

24

by the Trustee's inclusion of paragraph 10, permitting the Debtor to proceed to a discharge. That generates significant value solely to the benefit of the Debtor, without requiring the Debtor to relinquish any of the rights he may think he  may still possess.

The Debtor has persistently and continuously manipulated the bankruptcy system for his own ends and at the expense of his Estate. The only reason that the Debtor has been able to stave off paying his creditors is because he enjoys the protection of the automatic stay provided by this Court. The Bankruptcy Code together with the Bankruptcy Rules are meant to be "construed, administered, and employed . . . to secure [a] just, speedy, and inexpensive determination of every case and proceeding." *See* Fed. R. Bankr. P. 1001(a). The arc of this case has proven to be the opposite. Unfortunately, the Debtor continues to burden the Estate with mounting administrative expenses including the attorneys' fees the Estate incurs responding to the Debtor's frivolous pleadings and appeals. The Debtor will then file pleadings complaining about the mounting expenses only to further exacerbate the ever-increasing cycle of needless expense. The Debtor understands that he is responsible for the mounting costs spurred by his litigation tactics. And yet, as aptly described by the Trustee, Malloy continues to engage in this pattern of self-harm.

This Settlement Agreement provides a roadmap out of this chaos and points a direction toward a final and efficient end – one that envisions an orderly administration of the Debtor's bankruptcy estate that will allow the breach of Contract dispute to be fully and finally resolved. By entering into this Settlement Agreement, the Creditors have indicated their consent and desire to end it. Not only is this Settlement Agreement in the best interests of the Estate, but it is also fair and equitable and in the best interests of the Debtor. The time has come for Malloy to accept responsibility for breach of the Contract and endure the resulting consequence.

25

## CONCLUSION

"The settlement of time-consuming, burdensome, and uncertain litigation—especially in the bankruptcy context—is encouraged." *In re Health Diagnostic Lab'y, Inc.*, 588 B.R. at 168-69. The Court agrees with the business judgment of the Trustee that the Settlement Agreement presents the most efficient resolution of the claims by and among the Estate and the Creditors. As the Settlement Agreement is fair and equitable and is in the best interests of all creditors and parties in interest, including the Debtor, the Court will grant the Settlement Motion and approve the Settlement Agreement under Bankruptcy Rule 9019.

A separate Order shall issue.

Dated:   July 15, 2026            /s/ Kevin R. Huennekens
                                  UNITED STATES BANKRUPTCY COURT

                                  Entered on Docket:   July 15 2026

**Copies to:**

**Karl Linard Malloy**
1600 Mill Quarter Road
Powhatan, VA 23139

**William Anthony Broscious**
P.O. Box 71180
Henrico, VA 23255

**Christian K. Vogel**
Vogel Law Group, PLC
513 Forest Ave.
Suite 205
Richmond, VA 23229

**Michael T. Freeman**
Office of the US Trustee
1725 Duke Street, Suite 650
Alexandria, VA 22314

26

**Christopher L. Perkins**
Eckert Seamans Cherin & Mellott, LLC
919 East Main Street, Suite 1300
Richmond, VA 23219

**E. Duffy Myrtetus**
Eckert Seamans Cherin & Mellott, LLC
919 East Main Street, Suite 1300
Richmond, VA 23219